THOMPSON, Presiding Judge,
dissenting.
S.M.M. (“the mother”) and J.D.K. (“the father”) were divorced on approximately July 26, 2011. The divorce judgment incorporated an agreement that, in pertinent part, provided that the mother be awarded sole custody of the parties’ two minor daughters (hereinafter “the daughters”) and that the father receive “supervised visitation at the discretion of [the mother] supervised by the [mother] or a person of her choice.”
It is undisputed that in April 2011, shortly before the parties entered into the agreement incorporated into the July 26, 2011, divorce judgment, the father pleaded guilty to a charge of second-degree rape for engaging in a sexual relationship with a 14- to 15-year-old girl.[12] The record indicates that the father attended but did not complete seminary. The girl he is convicted of raping had attended the youth ministry run by the father at a local church. The father was 33 years old when he began his relationship with the girl in the summer of 2010.
In January 2012, only six months after the entry of the divorce judgment that incorporated the parties’ agreement, the father sought to modify the divorce judgment to increase his visitation with the parties’ two minor daughters and to remove the requirement that his visitation with the daughters be supervised. Testimony was taken over two days in 2012 with regard to pendente lite relief, and then the father’s request for a modification of visitation was heard over three days in August 2014. The record contains approximately 1,200 pages of testimony and numerous exhibits. On August 28, 2014, the trial court entered a judgment finding that there had been “a material change in circumstances” and awarding the father a standard schedule of unsupervised visitation.[13]
I agree, generally, with the main opinion that matters of visitation, particularly when the trial court has received ore tenus evidence, are within the discretion of the trial court.[14] I would add to that analysis, *1130 however, that our caselaw has stated that a party seeking to modify visitation must show both a material change in circumstances since the entry of the most recent judgment concerning visitation and that a modification of visitation would serve the best interests of the children at issue. Griffin v. Griffin, 159 So.3d 67, 70 (Ala.Civ.App.2014); Baird v. Hubbart, 98 So.3d 1158, 1163 (Ala.Civ.App.2012); and Flanagan v. Flanagan, 656 So.2d 1228 (Ala.Civ.App.1995). See also N.T. v. P.G., 54 So.3d 918, 920 (Ala.Civ.App.2010) (“On a petition to modify visitation, a court does not reexamine the evidence to determine if its original judgment was correct; rather, it decides whether modification is warranted based on changed circumstances.”); compare Watson v. Watson, 634 So.2d 589 (Ala.Civ.App.1994) (holding that because the parties were awarded joint custody in the original divorce judgment, the best-interests-of-the-child standard applied to the custody and visitation modifications at issue in that case).
The main opinion, in affirming the trial court’s modification judgment, concludes that
“the circuit court could properly have determined from the evidence that the father’s continuing psychiatric treatment, his remorse for his indiscreet behavior with a child significantly older than his own children, the absence of any ongoing risk to the children of sexual contact from the father, the mother’s denial of visitation, and the children’s inhibited relationship with the father, taken together, amounted to a material change in circumstances so as to warrant the removal of the supervised-visitation requirement and of the mother’s exclusive right to dictate the father’s visitation....”
208 So.3d at 1122.
My review of the record, however, indicates that the father was seeing a psychiatrist at the time of the entry of the divorce judgment and that the father testified at the August 2014 hearing that, at the time of the entry of the divorce judgment, he was remorseful for his sexual relationship with the teenaged girl. The father agreed that the divorce judgment contained a provision providing him visitation at the mother’s discretion and requiring that his visitation be supervised by the mother or someone the mother selected. Thus, the father agreed to the conditions that resulted in the alleged “inhibited” relationship with the children. 208 So.3d at 1122. I cannot agree that any of the factors discussed above demonstrate a material change in circumstances between the facts as they existed at the time of the entry of the divorce judgment and at the time of the entry of the modification judgment.[15] *1131 The record indicates that the only arguable change in circumstances that occurred was the mother’s denial of the father’s visitation after he filed his modification petition and after she learned that an investigation in Missouri had substantiated accusations that the father had sexually abused a child in that state in 2006. I am not convinced, given the terms of the divorce judgment, that the mother’s denial of visitation is outside the discretion afforded the mother by the divorce judgment. The trial court, in incorporating the parties’ agreement into the divorce judgment, afforded the mother discretion in determining when and if the father was to visit the children, and the mother, after the entry of the divorce judgment, - exercised that discretion, albeit not in a manner with which the father agreed. While this court would generally not affirm a judgment placing visitation at the discretion of the other parent, the father did not appeal the divorce judgment. Therefore, any error in the visitation provision of the divorce judgment “bec[a]me the law of the case, subject to modification only upon a showing of changed circumstances.” N.T. v. P.G., 54 So.3d at 920 (citing McQuinn v. McQuinn, 866 So.2d 570, 575 (Ala.Civ.App.2003)) (holding that any error in the original judgment that granted the former custodians visitation with the children became the law of the case after the mother failed to challenge that judgment and that the error could not be remedied in a modification action).
“On a petition to modify visitation, a court does not reexamine the evidence to determine if its original judgment was correct; rather, it decides whether modification is warranted based on changed circumstances.” N.T. v. P.G., 54 So.3d at 920. In this case, the father sought to modify the visitation awarded in the divorce judgment, and, therefore, he had the burden of proof. “The father, as the party seeking to remove the restriction on his visitation with the child[ren], had the burden of demonstrating that there had been a material change in circumstances since the entry of the divorce judgment and that the best interests and welfare of the child[ren] warrant the modification.” H.H.J. v. K.T.J., 114 So.3d 36, 41 (Ala.Civ.App.2012). Given the particular facts of this ease, I disagree with the conclusion in the main opinion that the father met his burden for a modification of visitation, and, therefore, I conclude that the trial court erred in modifying visitation in its August 28,2015, judgment.
Even assuming, for the sake of argument, that the mother’s denial of visitation to the father under the facts of this case could be said to constitute a material change of circumstances warranting a modification of the visitation provision of the parties’ divorce judgment, I still dissent. I conclude that the trial court’s award of unsupervised, alternating-week *1132 end visitation to the father was plainly and palpably wrong. The mother opposed the modification of visitation on the basis that she believed that the father was grooming the daughters for future abuse, as she believed he had similarly groomed other children. The evidence in the record provides a clear basis for that concern, and the trial court’s judgment provides no method for protecting the parties’ young daughters. The primary consideration in establishing visitation for a noncustodial parent is the best interests of the children, and, when appropriate, the trial court must "set conditions on visitation that protect the children].” Ex parte Thompson, 51 So.3d 265, 272 (Ala.2010). I do not believe that the trial court’s award of unsupervised, alternating-weekend visitation between the father and the children adequately protects the welfare of the children or serves their best interests.
The main opinion contains only a brief recitation of some of the evidence, and this writing does not attempt to include a full statement of the facts. I recognize that the evidence the father presented tended to support a claim in support of visitation. However, this case does not involve an initial award of visitation but rather, a modification of visitation; therefore, the father has a greater burden of proof. Further, as explained below, I conclude that the trial court’s judgment is not supported by substantial evidence and is plainly and palpably wrong.
Although Dr. Marilyn Elizabeth Lach-man, the psychiatrist who testified in support of the father, testified that she did not believe that the father posed a greater risk to the children than anyone else, Dr. Lach-man also insisted that, at the time he was engaged in the relationship with the 15-year-old girl, the father did not recognize the wrongfulness or criminality of his conduct, The father admitted in his own testimony, however, that he understood the wrongfulness of his actions throughout the relationship with the girl from his youth ministry. Dr. Laehman stated that because, in her opinion, the father had not understood that his abuse of the 15-year-old girl was wrongful, the father had difficulty conforming his conduct to the law, i.e., not engaging in a sexual relationship with a young teenager. Based on those beliefs, Dr. Laehman concluded that the father was unlikely to engage in that “wrongful conduct,” because, she said, there was no pattern in his conduct, stating in her report: “In the life of this caring and gentle man, this experience is a one-time peccadillo without any evidence to suggest a past recurring pattern of behavior or a future recurring pattern of behavior.”
My review of the record indicates that there is a pattern by the father of inappropriate conduct toward young girls. The father’s conduct and failure to respect boundaries between him and young girls was questioned in Missouri in 2006 with respect to his conduct toward two fifth- or sixth-grade girls who attended an after-school program at which the father worked. The director of the after-school program spoke to the father about complaints by those girls. Although the father denied any inappropriate conduct with those girls, the director of the after-school program spoke with the father about maintaining appropriate boundaries with children. After the father pleaded guilty to second-degree rape in Alabama in 2011, an investigation into his actions in Missouri resulted in a determination by a Missouri state agency that the allegations of sexual abuse by the father toward one of the girls in Missouri was “substantiated.” Other evidence in the record makes it clear that maintaining appropriate boundaries with children was also a part of the father’s seminary training and his church training.
*1133 The evidence concerning the father’s interactions with a Haitian orphan who lived with the parties for a period after the 2006 Missouri incident and shortly before the parties’ daughters were born indicates that the father failed to maintain appropriate boundaries with that girl as well. During the 2014 hearing, the father denied inappropriate contact with the Haitian girl, and he stated that the Haitian girl had made advances toward him on several occasions. However, during the 2012 pendente lite hearing in this matter, the father described an incident of “passionate hugging” and “rubbing” with the Haitian girl that he denied was sexual in nature. A friend of the parties testified to having observed the father lounging on the sofa with the Haitian girl while she lived in the parties’ home; the father denied that incident. The mother testified that the father had refused the Haitian girl’s request that she be allowed to lock her bedroom door during the time she lived in the parties’ home. The father pointed out during his testimony that the Haitian orphan was 17 years old. However, a witness’s description of the Haitian girl and photographs of her submitted into evidence support the mother’s contention that the Haitian girl was small for her age and appeared much younger than 17 years of age.
Thereafter, the father again failed to maintain appropriate boundaries in his youth ministry in Alabama in his relationship with the 14- to 15-year-old girl. The father testified that the then 14-year-old girl initiated the contact that started their “relationship,” which the father consistently referred to as “adulterous,” rather than as abusive. The record reveals that the father engaged in sexual touching of the girl in his youth ministry in a church van and again while sharing a blanket with the girl while watching a movie in the church pastor’s home.[16] The father arranged a sexual liaison with that girl at approximately the time of her 15th birthday, at a time when he knew the girl’s parents were not home. The father also admitted that he arranged a meeting with the girl and engaged in sex with her at the church after the other members of the youth ministry had left a church event.
The mother presented evidence indicating that, during his relationship with the 15-year-old girl, the father sent the girl flowers, t-shirts, underwear, and teddy bears, which were gifts identical to the types of gifts the father sent the mother during their courtship. The mother stated that she has objected to the father’s lavish gifts to the daughters during visitation, and that he has repeatedly sent the daughters flowers; the mother testified that she has refused any further deliveries of flowers for the daughters from the father. The father admitted that, in addition to the other gifts, in January 2015 he gave the girl from his youth ministry a ring engraved with Scripture from the Song of Solomon, which read: “I am my Beloved’s, and my Beloved is mine.” The father testified that that quote was meant to remind the girl of her relationship to Christ, as she was struggling, in her faith at the time. Only after questioning on cross-examination did he admit that the quotation has another, more romantic meaning.
Thus, contrary to the testimony of the father’s psychiatrist, I conclude that the evidence before the trial court demonstrates that there has been a pattern in the father’s conduct toward young girls. The mother attempted to speak with the psychiatrist on two occasions, but the psychiatrist canceled both of those appointments because of emergencies. Thus, the *1134 psychiatrist based her opinion solely on the information the father related to her. In this case, that causes concern not only because the psychiatrist insisted that the father did not appreciate the wrongfulness of his conduct (a fact the father himself disputed), but because of the psychiatrist’s opinion that the father felt “so much guilt that he shared [the nature of his relationship with the girl in his youth ministry] with his pastor, his wife at the time, and then the District Attorney.” The father admitted that, on the morning after he sexually touched the girl from his youth ministry while watching a movie at the pastor’s home, the pastor confronted him and questioned him about the relationship, and, the father said, he denied the relationship. The record indicates that the father adamantly denied the relationship to the mother and that he confessed to the inappropriate relationship days or a week later. Thus, although it is clear that the father felt guilt over his relationship with the girl from his youth ministry, it is also clear that he confessed only after others became suspicious of the nature of that relationship and confronted the father about it. That behavior seems consistent with his conduct with regard to the Haitian orphan who briefly lived in the parties’ home. The testimony of the father’s friends from seminary indicates that the father had specific opportunities to seek advice and maintain accountability with other Christian leaders during his experiences with the Haitian girl and the 15-year-old girl in Alabama, yet the father failed to do so.[17] Further, the mother testified that the family’s telephone bills indicate that, between the time of the father’s confession to her about his inappropriate relationship with the girl and the date of the father’s conviction for second-degree rape, the father continued to send and receive numerous texts to and from the 15-year-old girl who was his victim.
The father’s evidence relied a great deal on his Christian faith and his assurances that, because of the tenants of his faith, he would not again sexually abuse a child. I appreciate the father’s continued efforts to follow in his faith and to seek forgiveness for his actions. However, the fact remains that the father is and was not a youth who exercised bad judgment on one occasion. Rather, the father was 29 years old when, the record demonstrates, he was first reminded by a former employer of the necessity of maintaining appropriate boundaries with children in his care. He was older when the Haitian girl lived in his home and he engaged in inappropriate contact with her. The father was 33 years old when he began the inappropriate relationship with the 14-year-old girl from his youth group. Despite warnings from a former employer and training within the church, the father has either repeatedly failed or has been unable to maintain appropriate boundaries with girls within his sphere of contact.
I fully understand and agree with the bases for the mother’s concern about the safety of the daughters if they are left with the father during unsupervised visitation. Given the evidence of the father’s past behavior and his continued lavishing of the daughters with gifts during visitation, the father’s excuses that the Haitian orphan and the then-14-year-old girl in his youth ministry initiated the contact, and his insistence on referring to his sexual relationship with the young teenager from his youth ministry that resulted in his rape conviction as “adultery,” I believe that the mother’s concerns that the father could groom the daughters for future abuse are well-founded. The father has repeatedly *1135 demonstrated that he cannot or will not abide by appropriate boundaries with young teenaged girls. I do not believe that the fact that the girl with whom the father had a sexual relationship was, as the main opinion characterizes her, “significantly older than his own children,” is an appropriate basis upon which to base, in part, the award of unsupervised visitation with the father. 208 So.3d at 1122. The daughters will continue to age and will soon be the age of the father’s victims. As the main opinion points out, one of the experts who testified stated that “she perceived no difference between a person’s sexual attraction to children in general and the arguably separate matter of potential attraction to children with whom a person has a biological relation.” 208 So.3d at 1121-22. Thus, the evidence indicates that the fact that the daughters are related to the father will not guarantee their safety from possible abuse.
The record in this matter contains 1,200 pages of transcript and a number of exhibits. I have considered the evidence, which is briefly set forth by the main opinion and more fully discussed in Judge Moore’s writing, that arguably tends to support the trial court’s visitation award. I recognize that a visitation award based on ore tenus evidence may be reversed only when it is plainly made in error. See H.H.J. v. K.T.J., 114 So.3d at 40. In my opinion, the evidence, as discussed in this writing, amply demonstrates that this case is one in which there should be grave concern for the safety and well-being of the young children at issue. See Rasp v. Ballard, 651 So.2d 39, 42 (Ala.Civ.App.1994) (“The paramount consideration in awarding visitation is the best interests and welfare of the child.”); Sullivan v. Sullivan, 631 So.2d 1028, 1029 (Ala.Civ.App.1993) (“Every case pertaining to a noncustodial parent’s visitation rights requires an examination of the facts and circumstances of the individual situation.... The paramount consideration in visitation cases is the best interests and welfare of the child.”). This court, too, is charged with guarding the best interests of the children. My review of the entire record leads me to conclude that, in this case, the trial court was plainly and palpably wrong in concluding that the father had met his burden of demonstrating a material change of circumstances warranting the modification of the original visitation award.
Even assuming that such a modification were warranted, however, I conclude that the trial court’s award of a standard schedule of unsupervised visitation between the father and the daughters is plainly and palpably wrong. I believe that, under the facts of this case, such an award fails to protect the best interests and safety of the daughters, which must be the court’s paramount concern in matters pertaining to visitation. Sullivan v. Sullivan, 631 So.2d at 1029. “[A] trial court establishing visitation privileges for a noncustodial parent must consider the best interests of the child, and, when appropriate, it must set conditions on visitation that protect the child.” Casey v. Casey, 85 So.3d 435, 440 (Ala.Civ.App.2011) (citing Ex parte Thompson, 51 So.3d at 272).
The modification judgment at issue provides no method by which the parties’ young children could be protected and no method by which the father can continue to attempt to safely establish his relationship with the daughters and prove his reliability and safety with them. Accordingly, I dissent.
THOMAS, J., concurs.

.The father began what he characterized as an "emotional relationship” with the girl in the summer of 2010, when the girl was 14 years old. The father stated that he could not recall whether he engaged in a sexual relationship with the girl before her 15th birthday in late February 2011. Some evidence supports a conclusion that the father engaged in sexual activity with the girl as early as December 2010, when she was 14. Regardless, the father admitted that his relationship with the 14-year-old girl was inappropriate during the seven months before he claimed the sexual relationship began.

. The father testified that he was no longer pursuing his claim seeking the modification of his child-support obligation, and, in its judgment in this matter, the trial court denied all requests for relief not specifically addressed in the judgment.

. I also agree with the conclusion in the main opinion that § 30-3-150, Ala.Code 1975, which addresses the state policy concerning an award of joint custody, is "not directly applicable” to the facts of this case. 208 So.3d at 1122. Section 30-3-157, Ala. Code 1975, provides that the article of which *1130 § 30-3-150 is a part “shall not be construed as grounds for modification of an existing order.” I agree with the assertion, relied upon by the judges concurring in the main opinion, in reaching their holding, that § 30-3-150 "is consistent with the common-law principle that a noncustodial parent should generally be afforded 'reasonable rights of visitation.’ ” 208 So.3d at 1122 (emphasis added). However, this case does not involve an award of visitation in what could be considered a common divorce action. Rather, as is discussed in this writing, this case involves a request to modify an award of supervised visitation that was in place because of the father’s criminal actions, and the father was required to demonstrate a material change in circumstances and that the change would promote the children’s best interests. Griffin v. Griffin, 159 So.3d 67, 70 (Ala.Civ.App.2014); Baird v. Hubbart, 98 So.3d 1158, 1163 (Ala.Civ.App.2012); and Flanagan v. Flanagan, 656 So.2d 1228 (Ala.Civ.App.1995).

. As Judge Moore notes in his writing, this court has held that, in considering a custody-modification petition, a trial court that did not receive ore tenus evidence before entering its previous judgment may consider evidence pertaining to periods occurring before the *1131 entry of that judgment. See C.P. v. W.M., 806 So.2d 395, 396-97 (Ala.Civ.App.2001). However, caution should be exercised to ensure that the evidence pertaining to the periods occurring before the entry of that most recent judgment is considered only to establish the facts that existed at the time the parties entered into the agreement upon which the most recent judgment was based; those facts should not be used to reexamine the most recent custody or visitation award, or as a basis for determining that the most recent award should have been different than the award to which the parties agreed. To do otherwise would discourage amicable settlement agreements between the parties and work to the disadvantage of the party who makes other concessions in negotiating the visitation or custody provision. For example, in this case, the mother might have forgone certain rights or claims in order to negotiate the visitation provision that the father sought to modify almost immediately following the entry of the divorce judgment.

. As is explained later in this writing, the church pastor confronted the father the following day about his relationship with the 15-year-old in his youth ministry.

. One of those friends testified that he had been tempted by a girl or woman and had sought the father's counsel and prayer in resisting that situation.